UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------X

IN THE MATTER OF THE
EXTRADITION OF JHON DARWIN
LEON HERAS

**MEMORANDUM
AND ORDER**
22-MJ-271 (TAM)

---------------------------------------------------------X

**TARYN A. MERKL**, United States Magistrate Judge:

The United States of America (the "government"), fulfilling its treaty obligation

to the Republic of Ecuador ("Ecuador"), filed a complaint on March 9, 2022, requesting

that Jhon Darwin Leon Heras ("Relator" or "Leon Heras") be detained and extradited.

(*See* Complaint ("Compl."), ECF No. 1.) Following an extradition hearing, the Court

concludes that the extradition of Jhon Darwin Leon Heras is warranted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The complaint in support of extradition alleges that: "On or about the evening of

October 12, 2014, []or early morning of October 13, 2014, Leon Heras and Cristian

Marcelo Sarmiento Heras ('Sarmiento Heras') were at a late-night party with Juan

Carlos Heras Cedeño ('Heras Cedeño'), Jorge Javier Urgilés Paredes ('Urgilés Paredes'),

and others." (Compl., ECF No. 1, ¶ 6(a).) "After the party ended, the four men went to

Heras Cedeño's home and [a] nearby area to continue drinking." (*Id.*) It is further

alleged that, at about 1 a.m., a fight ensued, and that Leon Heras and Sarmiento Heras

killed Heras Cedeño and Urgilés Paredes. (*Id.*) (*See* Extradition Request, ECF No. 1-3,[1] at

---

[1] The extradition package from Ecuador, submitted together with the January 27, 2022
Lindsay Declaration, was also admitted into evidence during the extradition hearing. For ease
of reference, the citations to the extradition package herein refer to the version filed on ECF at
the commencement of this case. The package was docketed as attachments to the Lindsay
Declaration at ECF Nos. 1-1, 1-2, and 1-3. The Court refers to the entire package as the

90 (statement of Claudio Bolívar Rivera Heras discussing returning from the festival); *id.*, ECF No. 1-2, at 55 (alleging that the murders occurred at approximately 1 a.m.).) Sarmiento Heras, Heras Cedeño, and Urgilés Paredes are referred to herein as "Sarmiento," "Cedeño," and "Paredes."

As set forth in more detail below, various witnesses informed the authorities in Ecuador that, on the night of the murders, they heard an argument between the four men, and at least one witness heard Leon Heras direct Sarmiento to bring a machete. (Extradition Request, ECF No. 1-3, at 87 (witness statement of Erika Rocío Ochoa Heras).) Another witness, Luis Rigoberto Correa Garcia ("Luis"),[2] who lived approximately 150 meters from where the bodies of Cedeño and Paredes were found, testified that Paredes arrived to his home at approximately 1 a.m. asking for help because Sarmiento and Leon Heras "were mortally assaulting" Cedeño. (Supplement, ECF No. 19-1, at 46 (summary of testimony of Luis at Sarmiento's trial).) Believing Paredes to be drunk, Luis did not believe what Paredes was saying to be important, and Paredes then left in the direction from which he had come. (*Id.*) The following morning, Paredes's body was found in a ravine in some bushes, partially submerged in a puddle; Cedeño's body was approximately 50 meters away, near the ravine. (Extradition Request, ECF No. 1-2, at 96, 98; ECF No. 1-3, at 10.) Both men had been killed as a result of multiple strikes with bladed weapons and blunt objects. (*See* Extradition Request, ECF No. 1-3, at 16 (autopsy report for Cedeño); *id.* at 25 (autopsy report for Paredes).)

---

"Extradition Request," and includes the ECF filing and ECF page number within those filings when citing to it. (*See* Extradition Request, ECF Nos. 1-1, 1-2 & 1-3.)

[2] The witnesses are referred to herein by first name for ease of reference due to the fact that many of the witnesses share common last names.

2

On October 15, 2014, an Ecuadorian judge issued a warrant for Leon Heras's arrest for the crime of murder as described in Article 140, subsections 4, 6, and 7 of Ecuador's Comprehensive Organic Penal Code. (Compl., ECF No. 1, ¶¶ 4, 5; Extradition Request, ECF No. 1-2, at 80.) On June 24, 2015, the Ecuadorian government submitted a formal extradition request to U.S. officials for Leon Heras. (*See* Lindsay Decl. (dated Jan. 27, 2022), ECF No. 1-1 (referred to herein as "Lindsay Decl."), ¶ 3; Extradition Request, ECF No. 1-1, at 4.) Thereafter, on February 11, 2022, a magistrate judge in the Southern District of New York issued an arrest warrant for Leon Heras. (Compl., ECF No. 1, ¶ 7.)

On March 9, 2022, Leon Heras was arrested in Queens, New York, taken into custody in the Eastern District of New York, and arraigned before this Court. (*See id.*; Mar. 9, 2022 ECF Minute Entry.) On September 22, 2022, the government filed a supplemental submission from Ecuador in further support of extradition. (*See* Supplemental Submission ("Supplement"), ECF No. 19-1.) The Supplement includes a formal diplomatic note and other documents submitted in support of Ecuador's extradition request. (*Id.* at ECF p. 7 (certification from U.S. Ambassador to Ecuador).) The Supplement also includes a copy of the Ecuadorian judgment against Relator's co-defendant in Ecuador, Sarmiento, which provides a detailed summary of the evidence that the court considered at Sarmiento's trial in Ecuador. (*Id.* at ECF pp. 44–66.)

In the meantime, Leon Heras moved for bond pending extradition, as well as discovery. *See In re Extradition of Leon Heras*, No. 22-MJ-271 (TAM), 2022 WL 3909174 (E.D.N.Y. Aug. 31, 2022) (denying motion for bond); *In re Extradition of Leon Heras*, No. 22-MJ-271 (TAM), 2022 WL 17740191 (E.D.N.Y. Dec. 16, 2022) (denying motion for discovery). After briefing, argument, and denial of both motions, the Court held an extradition hearing on January 6, 2023. (Jan. 6, 2023 ECF Minute Entry; Tr. of Extradition Hearing, ECF No. 25 ("Tr.").) At the hearing, the Court directed the

government to submit a supplemental filing clarifying certain exhibits offered at the hearing. (Jan. 6, 2023 ECF Minute Entry; Tr. at 21:9–17, 45:5–46:3; *see* Gov't Ltr., ECF No. 24.) Relator then filed a response. (*See* Leon Heras Ltr., ECF No. 26.)

As noted above, Ecuador has charged Leon Heras with murder under three subsections of the Ecuadorian murder statute; each subsection describes specific circumstances under which the killing of another person is considered murder under Ecuadorian law. Due to the way the charges were described in the extradition request, on March 9, 2023, the Court issued an order directing the parties to submit supplemental briefing on two topics: first, "whether the Court must make a probable cause determination as to *each* circumstance for murder that [Leon Heras] could stand trial for in Ecuador if extradited," and second, "if the Court finds probable cause as to any one of the circumstances, whether Ecuadorian law allows for trial and/or a judgment of conviction based on a finding of a *different* circumstance than those named in the pending Ecuadorian charges and/or any extradition order." (Mar. 9, 2023 ECF Order.) The parties disagree on whether the Court must make a particularized finding of probable cause as to all of the circumstances proffered by Ecuador. (*See* Gov't Supplemental Br., ECF No. 29 ("Gov't Supp."); Leon Heras Supplemental Br., ECF No. 30 ("Leon Heras Supp."); Gov't Reply, ECF No. 32.)

As to whether Leon Heras can stand trial in Ecuador based on all of the subsections specified in the extradition request if the Court does not find probable cause as to all of them for both killings, the government's letter states as follows:

> [I]n an abundance of caution, the Department of Justice, Office of International Affairs, has conferred with Ecuadorian authorities, which confirmed that if the United States were to issue a surrender warrant specifying that it was surrendering Leon Heras to stand trial for the offense of murder under a particular sub-item (or sub-items) within Article 140, they would, in notifying the Ecuadorian trial court of the Secretary's decision, instruct the trial court to abide by such a limitation to

4

ensure that the prosecution remains within the scope of the extradition grant.

(Gov't Supp., ECF No. 29, at 5.) In his response to the government's representations as to what would occur in the event of a limited surrender warrant, Leon Heras agrees that the Court need not concern itself over the question of what could happen if the Court does not find probable cause as to all of the charged subsections. (Leon Heras Supp., ECF No. 30, at 5 (stating that, due to the government's representations, the question of what will happen as a matter of Ecuadorian law is moot).)

For the reasons set forth herein, the Court certifies Leon Heras's extraditability, but not as to all specifications of murder included in the arrest warrant from Ecuador.

## APPLICABLE LAW

As the Second Circuit observed in *Austin v. Healey*, "'[e]xtradition is the process by which a person charged with or convicted of a crime under the law of one state is arrested in another state and returned for trial and punishment.'" 5 F.3d 598, 600 (2d Cir. 1993) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 474, at 556–57 (1987)). Accordingly, the scope of extradition proceedings is relatively narrow.

First, the Court must confirm that it has jurisdiction. Title 18, United States Code, Section 3184 expressly states that magistrate judges "authorized so to do by a court of the United States" may conduct extradition proceedings. Further, in *Austin*, the Second Circuit squarely held that magistrate judges are empowered to conduct extradition hearings and concluded that such hearings may be held under the general authorization afforded by our Court's local rules. *Id.* at 602–03; E.D.N.Y. Local Civ. R. 59.1(b) ("Magistrate Judges are hereby authorized to exercise the jurisdiction set forth in 18 U.S.C. § 3184."). There is also no dispute that this Court has personal jurisdiction over

5

Leon Heras, who was arrested in Queens, New York, and has been incarcerated at the Metropolitan Detention Center in Brooklyn, New York, since his arrest — all within the Eastern District of New York. (Tr. at 3:6–12.)

Section 3184 also requires the examining judicial officer "to hold a hearing to determine if the person before the court is subject to surrender under the terms of the treaty at issue and the relevant law." *In re Extradition of Szepietowski*, No. 08-MJ-971 (CLP), 2009 WL 187568, at *4 (E.D.N.Y. Jan. 23, 2009). The hearing in this case was held on January 6, 2023, as discussed in more detail below. (*See* Jan. 6, 2023 ECF Minute Entry.) In deciding whether a person should be certified for extradition, courts must determine (1) "whether the offense charged is extraditable under the terms of the treaty;" and (2) "whether there was sufficient evidence to support the finding of probable cause to extradite." *Austin*, 5 F.3d at 600; *see Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *Ahmad v. Wigen*, 910 F.2d 1063, 1064 (2d Cir. 1990). More specifically, the extraditing court must determine if:

> 1) there is a valid extradition treaty between the requesting country and the United States; 2) there are criminal charges pending in the requesting state against the extraditee and the required documentation has been submitted to the Court; 3) the charges are extraditable offenses under the Treaty and dual criminality has been established; 4) the individual before the court is actually the person sought by the authorities of the foreign state; and 5) there is probable cause to believe that a crime was committed by the person before the court based on competent legal evidence presented to the court.

*In re Extradition of Szepietowski*, 2009 WL 187568, at *4.

The Court has carefully reviewed each of the exhibits and documents relied upon by the government in support of its extradition request and finds that the United States and Ecuador do have a valid extradition treaty, that there are criminal charges pending against Relator for murder in Ecuador, Leon Heras is the person sought by Ecuador, and that the offense charged here, murder, is extraditable under the terms of the treaty

and dual criminality exists. Finally, for the reasons set forth herein, the Court also finds that there is sufficient evidence to support a finding of probable cause that Relator committed murder in violation of Ecuadorian law.

## COMPLIANCE WITH THE TREATY

The Court next examines compliance with the applicable treaty, the Extradition Treaty Between the United States of America and the Republic of Ecuador, Ecuador-U.S., Jan. 10, 1873–Nov. 12, 1873, 18 Stat. 756 (hereinafter Extradition Treaty). In September 1939, the United States and Ecuador signed a supplemental extradition treaty. *See* Supplementary Extradition Treaty Between the United States of America and the Republic of Ecuador, Ecuador-U.S., Dec. 11, 1940–Dec. 20, 1940, 55 Stat. 1196. Under Article 2 of the original treaty, murder is specifically included as an extraditable offense. *See* Extradition Treaty, art. II, ¶ 1. The treaty further provides, in Article 5, that requests for the extradition of persons sought under the treaty "shall be made by the respective diplomatic agents of the contracting parties," and when the person has not yet been convicted, the request should include "a duly authenticated copy of the warrant" for the person's arrest and "any evidence in writing upon which such warrant may have been issued." *Id.*, art. V. If those procedures are followed, the party to the treaty may then order the person's arrest, and, if extradition is sought in conformity with the treaty, "the fugitive shall be delivered up." *Id.*

As noted above, on June 24, 2015, the Ecuadorian government submitted a formal extradition request to U.S. officials for Leon Heras. (*See* Lindsay Decl., ECF No. 1-1, ¶ 3; Extradition Request, ECF Nos. 1-1, 1-2 & 1-3.) The extradition request encloses a lengthy series of documents, in both Spanish and English, that provide a written overview of the evidence. The extradition package includes certified copies of official court records, including a detention order, and indicates that Leon Heras is charged

with the crime of murder, in violation of Article 140 of Ecuador's Organic Comprehensive Penal Code, with specific reference to subsections 4, 6, and 7 of that Article. (*See* Extradition Request, ECF No. 1-2, at 68 & 70 (explanation of the charges); *see also id.* at 91 (detention order).) In addition, the extradition package and Supplement include an array of authenticated documents that Ecuador has submitted to the United States that illustrate and summarize the charges against Relator, as well as the evidence in the case, including police reports, witness statements, photographs of the crime scene, a crime scene diagram, a report regarding a crime scene reconstruction, autopsy photographs, summaries of the testimony given at the trial of Sarmiento, and other exhibits.[3] (*See* Extradition Request, ECF Nos. 1-1, 1-2 & 1-3; Supplement, ECF No. 19-1.)

## DISCUSSION

### I.  Legal Standards

In an extradition proceeding, the demanding state does not need to prove actual guilt; it only has to show probable cause. *Shapiro v. Ferrandina*, 355 F. Supp. 563, 571 (S.D.N.Y. 1973), *aff'd as modified*, 478 F.2d 894 (2d Cir. 1973). This general rule is specifically codified in the U.S.-Ecuador treaty, which provides that the contracting states "agree to deliver up" persons who are accused of specific crimes when the "criminality" of the person can be "proved in such manner that, according to the laws of the country where the fugitive or accused may be found, such persons might be lawfully arrested and tried, had the crime been committed within its jurisdiction."

---

[3] The Court notes that the rules of evidence do not apply in extradition proceedings, that "[h]earsay evidence is admissible, and unsworn statements of absent witnesses may be considered." *Skaftouros v. United States*, 667 F.3d 144, 155 n.16 (2d Cir. 2011) (citations omitted); *see also Collins v. Loisel*, 259 U.S. 309, 317 (1922) (recognizing that extradition may be ordered based upon "unsworn statements of absent witnesses"); *see also United States v. Pena-Bencosme*, No. 05-MJ-1518 (SMG), 2006 WL 3290361, at *2 (E.D.N.Y. Nov. 13, 2006) (collecting cases). Here, the witness information provided by Ecuador consists of unsworn statements of witnesses memorialized by the Ecuadorian prosecutor and summaries of witness testimony from Sarmiento's trial. (*See generally* Gov't Ltr., ECF No. 24.)

Extradition Treaty, art. I. Given that Leon Heras was found in the United States, the standard for his arrest is probable cause. It is well settled that "probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (quotation marks and alteration omitted). In the extradition context, probable cause has been defined as evidence "'sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.'" *In re Extradition of Atta*, 706 F. Supp. 1032, 1050 (E.D.N.Y. 1989) (quoting *Coleman v. Burnett*, 477 F.2d 1187, 1202 (D.C. Cir. 1973)); *see also In re Extradition of Szepietowski*, 2009 WL 187568, at *8.

In evaluating the sufficiency of the evidence in an extradition proceeding, the Court notes that the evidentiary rules that govern criminal cases "are not applicable" and that an "'extradition hearing is not the occasion for an adjudication of guilt or innocence.'" *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984) (quoting *Melia v. United States*, 667 F.2d 300, 302 (2d Cir. 1981)).[4] As the Second Circuit has held, at an

---

[4] Relatedly, although persons subject to extradition can offer evidence at an extradition hearing, the role of such evidence is limited. As the Second Circuit has held, while explanatory testimony is permitted, evidence that contradicts that of the extraditing country may be excluded. *See Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984). The purpose of permitting explanatory evidence is to afford a relator "the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause." *In re Extradition of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978). "The improbability or the vagueness of testimony may destroy the probability of guilt, but the tendering of witnesses who testify to an opposite version of the facts does not. The latter must await trial on the merits." *Shapiro v. Ferrandina*, 355 F. Supp. 563, 572 (S.D.N.Y. 1973), *aff'd as modified*, 478 F.2d 894 (2d Cir. 1973); *see also Skaftouros*, 667 F.3d at 155 n.16 (citing *Shapiro* and reiterating that a relator's right to introduce evidence is limited to explanatory, not contradictory, evidence); *In re Pena-Bencosme*, 341 F. App'x 681, 683 (2d Cir. 2009) (observing that a requesting country need "establish only probable cause" and that, as a result, "the existence of evidence contradicting or calling into question the requesting state's primary evidence ordinarily has no import").

extradition hearing, "[i]n the exercise of the extraditing judge's discretion, a fugitive may be permitted to offer explanatory testimony, but may not offer proof which contradicts that of the demanding country." *Id.* This is consistent with "the well-entrenched rule" "that extradition proceedings are not to be converted into a dress rehearsal trial." *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976). The Supreme Court cautioned against such an approach long ago, observing that the exclusion of evidence at an extradition hearing relating to the establishment of a defense was not error. *See Collins v. Loisel*, 259 U.S. 309, 316 (1922) (observing that recognition of a right to introduce evidence of a defense at the extradition stage would risk contravention of applicable extradition treaties by requiring a "full hearing and trial of [the] case here; and that might compel the demanding government to produce all its evidence here").

The Court now turns to whether the evidence submitted establishes probable cause to conclude that Leon Heras committed the murders for which Ecuador seeks his extradition.

## II. Analysis

At the extradition hearing, the government introduced four exhibits: the Lindsay Declaration (Exhibit 1) (filed at ECF No. 1-1); Ecuador's 2015 Submission in Support of Extradition (Exhibit 2) (see ECF Nos. 1-1, 1-2, and 1-3); a Supplemental Lindsay Declaration (Exhibit 3) (see ECF No. 19-1); and Ecuador's 2022 Supplemental Submission in Further Support of Extradition (Exhibit 4) (see ECF No. 19-1). (*See* Tr. at 10–11.) The Supplement includes a detailed summary of the evidence provided by various witnesses at the trial of Leon Heras's co-defendant, Sarmiento. (*See* Supplement, ECF No. 19-1.)

In his pre-extradition hearing brief, Leon Heras contends that he is not extraditable, arguing that (1) the proffered evidence does not establish probable cause

to conclude that the killings constitute murder under Ecuadorian law, and (2) there is insufficient evidence to establish probable cause to conclude that Leon Heras was personally involved in killing either victim. (Leon Heras Br., ECF No. 21, at 1.) He also urges this Court to find that he should not be extradited, given the poor prison conditions in Ecuador. (*Id.* at 18–21.) To that end, Leon Heras introduced evidence of prison conditions in Ecuador at the hearing, and he asks this Court to consider it. (Tr. at 37:1–21; *see* Exs. 2–4 to Mot. for Bond, ECF Nos. 8-2, 8-3 & 8-4.) At the hearing, although the government did not object to the admission of Relator's evidence regarding Ecuadorian prison conditions, the government did contest its relevance. (*See* Tr. at 37:12–14.) Following the hearing, the government submitted a proposed extradition certification order, and cases that include observations about humanitarian concerns. (Gov't Ltr., ECF No. 24.) In response, Leon Heras filed a letter requesting that the Court make specific factual findings regarding the prison conditions in Ecuador, in the event that Relator is deemed extraditable. (Leon Heras Ltr., ECF No. 26.)

Based on a review of the documents submitted to the United States in support of extradition, the Court finds that the government of Ecuador has demonstrated probable cause that Leon Heras committed the murders of Juan Carlos Heras Cedeño and Jorge Javier Urgilés Paredes, and that Leon Heras is extraditable for the crime of murder, as defined by Article 140 of Ecuador's Comprehensive Organic Penal Code. However, the Court's probable cause finding as to each victim differs somewhat and will be addressed specifically with reference to the subsections that define murder under Ecuadorian law.

### A.  The Ecuadorian Murder Statute

As set forth above, the Ecuadorian warrant for Leon Heras's arrest charged him with murder as described in Article 140, items 4, 6, and 7 of Ecuador's Comprehensive

Organic Penal Code. (Compl., ECF No. 1, ¶¶ 4–5; Extradition Request, ECF No. 1-2, at 84 (detailing the Ecuadorian Attorney General's finding that there is "enough legal merit to accuse" Leon Heras and Sarmiento with the crime of murder in violation of Article 140, numerals 4, 6, and 7); *id.* at 89–91 (detention order).) Article 140 of the Ecuadorian penal law criminalizes the crime of murder, as follows:

> Murder - The person who kills another shall be punished with custodial sentence of twenty-two to twenty-six years if any of the following circumstances occurs:
>
> . . .
>
> 4.  Search for that purpose the night or unpopulated sites.
>
> . . .
>
> 6.  Intentional or inhumanly increase the victim's pain.
>
> 7.  Prepare, facilitate, consummate or conceal another offense.

(Extradition Request, ECF No. 1-2, at 66.) Article 140 plainly provides that a person commits murder by killing another person if "any" of the listed circumstances "occur." (*Id.*) Accordingly, it is clear that the statute must be read in the disjunctive.[5] In other words, a finding of probable cause as to any one of the bases set forth in the arrest warrant for Leon Heras is sufficient to certify that he is extraditable for murder. *See In re Extradition of Szepietowski*, 2009 WL 187568, at *7 (finding that a statute prohibiting "deceitful misleading of a public officer or another person authorized to issue [a] document," was written in the disjunctive, and certifying extraditability because the evidence showed that the fugitive bribed Polish vehicle inspectors who were "authorized to issue" inspection certificates, without a finding as to whether they were

---

[5] As noted above, following the extradition hearing, the Court issued an order directing the parties to submit supplemental briefing on the question of whether the Court must make a probable cause determination as to each circumstance for murder specified in the extradition request. (Mar. 9, 2023 ECF Order.)

also "public officer[s]"); *In re Sindona*, 450 F. Supp. 672, 678 (S.D.N.Y. 1978) (interpreting an Italian statute "in the disjunctive" where it set forth a criminal penalty applicable to two distinct subsections, unseparated by a conjunction).

In this case, the documents submitted by Ecuador in support of extradition provide sufficient evidence from which to find probable cause that Leon Heras, together with Sarmiento, killed Cedeño and Paredes. However, because Ecuadorian law requires specific factual circumstances to bring those killings within the statutory definition of murder, the Court analyzes whether the statutory circumstances required by Article 140 are present in this case. The Court analyzes each subsection of Article 140 identified in the arrest warrant separately and, for the reasons discussed, finds that Ecuador has established probable cause for murder under subsections 4 and 6 of Article 140 for both victims. As to subsection 7, the Court finds probable cause that Leon Heras committed the crime of murder under this provision as to Paredes but not as to Cedeño, for the reasons discussed *infra*.

### B. The Evidence Submitted in Support of Extradition

Leon Heras posits, overall, that the evidence submitted in support of extradition fails to establish probable cause, and he also points to specific witness statements that he claims illustrate deficiencies and inconsistencies in the evidence.[6] (*See* Leon Heras

---

[6] To this end, Leon Heras posits that the evidence submitted by Ecuador shows "combat" or a "drunken mutual fight," thereby questioning who the initial aggressor was and implying, on some level, that Relator was acting in self defense. (Leon Heras Br., ECF No. 21, at 11, 16; *see id.* at 17 ("Mutual combat is not probable cause.").) On this issue, *In re Pena-Bencosme* is instructive. 341 F. App'x 681. In *In re Pena-Bencosme*, the relator submitted evidence suggesting that the victim "provoked the fatal confrontation with Pena-Bencosme, that [the victim] shot first, and that Pena-Bencosme returned fire, if at all, only in self defense." *Id.* at 683. On habeas review following a determination that Pena-Bencosme was extraditable, the Second Circuit observed that such evidence was not relevant, reiterating that the requirement underlying extradition is "that a requesting country establish only probable cause" and that, as a result, "the existence of evidence contradicting or calling into question the requesting state's primary evidence ordinarily has no import." *Id.* The analysis of *Pena-Bencosme* applies with

Br., ECF No. 21, at 3, 4–6.) Probable cause, however, must be evaluated "on the basis of the totality of the circumstances," and may be found where there is "'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution [to believe] that an offense has been committed'" by the accused. *United States v. Howard*, 489 F.3d 484, 491 (2d Cir. 2007) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). Having conducted an independent review of the evidence submitted by Ecuador, the Court finds that it establishes probable cause.

Starting with witness Claudio Bolívar Rivera Heras ("Claudio"), he told law enforcement that on October 12, 2014, he was at a festival where he saw his cousin Cedeño and Paredes. (Extradition Request, ECF No. 1-3, at 90.) He also saw "Jhon" (Leon Heras) and "Cristian" (Sarmiento), whose last names he did not know, with whom he left the festival at approximately 1 a.m. in the morning on Monday, October 13. (*Id.*) After returning from the festival, Claudio, Leon Heras and Sarmiento went to Cedeño's house,[7] where Claudio observed Leon Heras tell "Marcelo Heras" (Sarmiento) that he would teach him to fight; Leon Heras then began to kick Sarmiento, after which Claudio left for his sister Narcisa Ochoa's house, which was nearby. (*Id.*) While there, Claudio heard a noise, and Narcisa told him that Cedeño and Paredes were shouting, with Cedeño saying, "what are you doing in my house," after which Narcisa told Claudio that there was a fight amongst the four men, i.e., Leon Heras, Sarmiento,

---

equal force here. Leon Heras's articulation of a contradictory interpretation of the evidence proffered by Ecuador does not vitiate probable cause.

[7] In his statement to the Attorney General's office, Claudio described this as the house of "aunt Julia Heras." (*See* Extradition Request, ECF No. 1-3, at 90.) In context, and in light of the other witness statements, the record shows that this was Cedeño's home.

Cedeño, and Paredes. (*Id.*; *see also* Supplement, ECF No. 19-1, at 47 (summary of Claudio's testimony).)

Cristian Jhonnathan Ochoa Heras ("Cristian"), the son of Narcisa Ochoa, and who was a minor at the time of the murders, stated, in relevant part that, on the night of the murders, he saw Leon Heras kicking the pillar and balcony of a nearby house. (Extradition Request, ECF No. 1-3, at 85.) He also saw Leon Heras, Sarmiento, and his uncle (Claudio) drinking alcohol, but that his uncle then came to Narcisa's house to sleep. (*Id.*) Afterwards, Cristian overheard Paredes say, "not to hit him and leave him there," followed by the "sound of a machete against a pole and then silence[]." (*Id.*) Cristian also stated that he heard Cedeño say to "them what are you doing in my house."[8] (*Id.*)

Another witness, Erika Rocío Ochoa Heras ("Erika"), the daughter of Narcisa Ochoa, was also a minor at the time of the murders. (*Id.* at 87.) Erika stated that she lived with her mother and, on the night of the incident, she heard Leon Heras tell Sarmiento to bring a machete, and that she "heard that [Paredes] was screaming[,] asking not to kill [Cedeño]." (*Id.*) She further stated that she saw Leon Heras give "flying kicks to the handrail of the balcony," and that her uncle (Claudio) came home before "Juancho" (Cedeño) arrived back to the vicinity. (*Id.*)

In an effort to undercut Erika's statement, Leon Heras argues that the statement does not mention that Erika saw Relator striking either of the victims. (Leon Heras Br.,

---

[8] Leon Heras argues that Cristian did not clarify when Cedeño asked this question, or clarify who was meant by "them," in an apparent effort to suggest that this information does not specifically implicate Leon Heras and that the information is unreliable because it is imprecise. (Leon Heras Br., ECF No. 21, at 4.) However, given the other evidence that placed the four men together, including the statements of Claudio and Erika, and other evidence implicating Leon Heras more specifically, the lack of clarity as to timing and who Cristian meant by "them" does not undermine the Court's overall probable cause determination.

ECF No. 21, at 4 (quoting Extradition Request, ECF No. 1-3, at 87).) In addition, Leon

Heras argues that Erika's statement indicates that Paredes's cries "asking not to kill

[Cedeño]" occurred at the same time she saw Leon Heras giving "flying kicks to the

handrail of the balcony."[9] (*Id.* (quoting Extradition Request, ECF No. 1-3, at 87).) Leon

Heras claims that Erika's information is therefore unreliable, because "all" other

witnesses described Relator's martial arts display as occurring hours before the victims

were killed. (Leon Heras Br., ECF No. 21, at 15.) However, only two other witnesses,

Cristian and Claudio, testified to observing any sort of kicking or martial art stunts, and

neither stated that it occurred hours before the victims' deaths. (Extradition Request,

ECF No. 1-3, at 85 (Cristian statement); *id.* at 89 (Claudio statement).) Moreover, even if

their statements were in tension with one another, conflicting witness information does

not preclude a finding of probable cause. *See Crews v. County of Nassau*, 996 F. Supp. 2d

186, 206 (E.D.N.Y. 2014) (finding that probable cause was not vitiated by contradictory

witness statements).

In any case, Erika stated that she heard Leon Heras directing Sarmiento to bring

a machete, and that, "if he doesn't he will kill him, too," as well as Paredes's screaming

---

[9] Erika's original statement to the police includes the following, in pertinent part: "in the night of the incident I was in my room and I heard that Jhon Darwin Leon [Leon Heras] said to Cristian Sarmiento to bring a machete, and if he doesn't he will kill him, too, and then I heard that [Paredes] was screaming asking not to kill Juancho (Juan Carlos Heras Cedeño), moreover, in that moment the music was at high volume and I could watch that Jhon Leon [Leon Heras] gave flying kicks to the handrail of the balcony." (Extradition Request, ECF No. 1-3, at 87.) Leon Heras appears to suggest that the phrase "in that moment" shows that Paredes's screams not to kill Cedeño happened simultaneously with when Erika observed Relator kicking the balcony. (Leon Heras Br., ECF No. 21, at 4.) However, Erika's statement also indicates that her uncle Claudio came home before Cedeño came back, that she overheard Leon Heras tell Cedeño that they had come to his house to drink, and that Cedeño went somewhere with them. (*See* Extradition Request, ECF No. 1-3, at 87.) Although imprecise as to the sequence of events given the abbreviated nature of the witness statement, read in its totality, Erika's statement is highly inculpatory as to Leon Heras, as was her trial testimony at Sarmiento's trial. (Supplement, ECF No. 19-1, at 52 (summarizing Erika's testimony, including that "Jorge [Paredes] was shouting desperately not to kill Juancho [Cedeño], he was addressing to Jhon [Leon Heras] and Cristian [Sarmiento]").)

"not to kill Juancho [Cedeño]." (Extradition Request, ECF No. 1-3, at 87 (Erika statement).) In addition, Leon Heras observes that, at an unspecified time, Erika stated that she "'heard that [Cedeño] said what are you doing in my house[,] referring to [Sarmiento] and [Leon Heras],'" and that after they said they were there to drink, Cedeño, "although initially reluctant," went with them. (*See* Leon Heras Br., ECF No. 21, at 4 (quoting Extradition Request, ECF No. 1-3, at 87).) Accordingly, although some of the details and timing may be unclear, when read in their totality, together with the crime scene evidence discussed *infra*, Erika's statements help establish probable cause that Leon Heras and Sarmiento saw Cedeño at his home, and then went to a relatively unpopulated, dark area, where Cedeño and Paredes were murdered.

Leon Heras also questions the information provided by witness Luis. As mentioned briefly above, Luis stated that Paredes had come to Luis's home, claiming that Cedeño was being hit by Heras and Sarmiento. (Extradition Request, ECF No. 1-3, at 89.) In his statement, Luis speculated that Paredes had witnessed the "fight" between Cedeño, Leon Heras, and Sarmiento, and that Leon Heras and Sarmiento killed Paredes. (*Id.* at 89.) Leon Heras asserts that this information is inconsistent with the government's theory, which, in his view, is that there was a single fight where both victims were killed, rather than at different times. (Leon Heras Br., ECF No. 21, at 5.) However, the government does not maintain that position, and that is not what the documents submitted in support of extradition suggest. Rather, the complaint specifically includes Luis's statements that Paredes had come to Luis's home calling for help, as well as Luis's impressions about the reason for Paredes's murder.[10] (*See* Compl.,

---

[10] Alternatively, Leon Heras may be pointing to the government's representation that "[o]n or about October 13, 2014, around 1 a.m., a fight ensued, and Leon Heras and Sarmiento Heras killed Heras Cedeño and Urgilés Paredes." (Compl., ECF No. 1, ¶ 6(a).) But given the

ECF No. 1, ¶ 6(e).) Moreover, at Sarmiento's trial, as set forth above, Luis testified that Paredes arrived at his home at approximately 1 a.m. asking for help because Sarmiento and Leon Heras "were mortally assaulting" Cedeño. (Supplement, ECF No. 19-1, at 46.)

Relatedly, Leon Heras claims that the government's theory as to the killing of Paredes is illogical. (Leon Heras Br., ECF No. 21, at 15.) Specifically, he points out that Paredes's body was found near Cedeño's, but that Luis's statements show that Paredes had approached Luis's home to seek help during the attack on Cedeño. (*See* Extradition Request, ECF No. 1-3, at 89 (statement of Luis).) Leon Heras argues that it "beggars belief that [Paredes] would simply have walked back to a place where he knew that he could be hit or killed." (Leon Heras Br., ECF No. 21, at 15.) Although it is unclear what motivated Paredes to return to where he came from after approaching Luis, whether it was illogical for Paredes to put himself back in harm's way instead of fleeing the scene is not an evidentiary discrepancy that undermines probable cause. Rather, passing on this question would require a determination about the facts that must await trial. *See Shapiro*, 355 F. Supp. at 572. Phrased another way, the information that Paredes sought help and then returned to where he came from, only to be murdered, does not undercut the Court's conclusion that the evidence submitted by Ecuador establishes probable cause. Regardless of what an ultimate trier of fact may make of the arguments about Paredes's actions that night, as the Second Circuit has observed, "the existence of evidence contradicting or calling into question the requesting state's primary evidence ordinarily has no import." *In re Pena-Bencosme*, 341 F. App'x 681, 683 (2d Cir. 2009); *see also Harrison v. County of Nassau*, No. 15-CV-2712 (JFB) (AKT), 2018 WL 5093257, at *14

---

sequence of events, this high-level description is not inaccurate; nor is it unreasonable to characterize Cedeño's death, Paredes's call for help, and Paredes's death as occurring during a single fight.

(E.D.N.Y. Aug. 31, 2018) ("[T]he existence of some inconsistencies will not dissipate probable cause."), *report and recommendation adopted*, 2018 WL 4583491 (E.D.N.Y. Sept. 24, 2018).

In addition to the evidence about what happened on the night of the homicides, at Sarmiento's trial, the prosecution presented witness testimony to establish that, before the killings, Sarmiento and Cedeño had been in a fight, in which Sarmiento had suffered a broken nose. (Supplement, ECF No. 19-1, at 48–49, 50, 52 (summaries of testimony of Julia Esther Heras Calle, Ruben Cristobal Heras Calle, and Juan Iban Heras Alvarado, and Nancy Auxiliadora Cedeño Loor).) Afterwards, Sarmiento threatened Cedeño, including by stating that his cousin from the United States would be coming to Ecuador. (*See id.*) For example, one witness testified that Sarmiento had "threatened many times to attack [Cedeño] severely" and that "[Sarmiento] was waiting for the arrival of [Leon Heras] who would take revenge, he would even kill him." (Supplement, ECF No. 19-1, at 52 (summary of testimony of Nancy Auxiliadora Cedeño Loor); *see also id.* at 49 (summary of testimony of Julia Esther Heras Calle) ("[Sarmiento] told her that a cousin was coming from the United States and that he would avenge the damages caused to him.").)

More broadly, Leon Heras argues that there are "no eyewitnesses . . . to the killing[s] of either of the alleged victims."[11] (Leon Heras Br., ECF No. 21, at 3-4.) As set

_____

[11] The complaint in support of extradition indicated that one witness, Maria Carmen Mejia ("Ms. Mejia") saw Leon Heras and Sarmiento striking Cedeño with a "chuzo," which the government represents is a stick reinforced with an iron spike. (Compl., ECF No. 1, ¶ 6(f).) Leon Heras challenges Ms. Mejia's testimony as ambiguous and imprecise. (*See* Leon Heras Br., ECF No. 21, at 3.) The Court notes that the Supplement explains that the court in Ecuador did not rely on the testimony of Ms. Mejia at Sarmiento's trial. (*See* Supplement, ECF No. 19-1, at 38, 52, 64.) This was because Ms. Mejia is a "[d]isabled deaf-mute" who was assisted by another individual who usually understands her, but that her testimony presented "subjectivities," could be "understood in different ways," and was "confusing, tangled and not precise." (*Id.* at 52.) Given that the Ecuadorian court already rejected her testimony in connection with the

19

forth above, however, probable cause may be found "on the basis of the totality of the circumstances," when "'reasonably trustworthy information'" demonstrates that the accused committed a crime. *Howard*, 489 F.3d at 491 (quoting *Panetta*, 460 F.3d at 395). Direct eyewitness testimony is not required, and to not certify extraditability on that ground would essentially transform probable cause into an almost insurmountable standard. Moreover, the arguable inconsistencies that Leon Heras has identified do little to undercut the existence of probable cause. As the Supreme Court has observed, "probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *see also Shaumyan v. O'Neill*, 987 F.2d 122, 125 (2d Cir. 1993) (observing that probable cause is a "low standard of proof"). The totality of the circumstances, including the witnesses discussed in detail herein, the autopsy reports and the crime scene evidence discussed below, establishes probable cause to conclude that Sarmiento and Leon Heras killed Paredes and Cedeño. The Court next turns to the question of whether there is sufficient probable cause to find that the homicides were murder under Ecuadorian law.

### C. Probable Cause Analysis as to Each Theory of Murder

#### 1. *Murder at Night or in an Unpopulated Site*

As set forth above, Article 140, subsection 4 requires that the accused "[s]earch for that purpose the night or unpopulated sites." (Extradition Request, ECF No. 1-2, at 66.) The evidence here shows that Leon Heras, Sarmiento, Cedeño, Paredes, and others attended a festival until late in the evening on October 12, 2014. (*See* ECF No. 1-3, at 90

---

resolution of the case against Sarmiento, this Court does not rely on the information from Ms. Mejia or her testimony in its analysis of whether to issue a certification of extraditability here. (*See id.* (finding that the testimony of Ms. Mejia "will not be considered in the evidentiary analysis").)

(statement of Claudio); *see also* Compl., ECF No. 1, ¶ 6.) After they returned from the festival, Leon Heras and Sarmiento went to Cedeño's home, after which witnesses overheard Cedeño ask what they were doing at his house, then going with them to drink. (Extradition Request, ECF No. 1-3, at 87 (statement of Erika).) In addition, as discussed above, Sarmiento had previously threatened Cedeño, including by invoking his cousin Leon Heras.

Cedeño's and Paredes's bodies were found 97 meters and 220 meters from the nearest residence, respectively. (*Id.*, ECF No. 1-3, at 55 (crime scene diagram).) Indeed, according to the police report, the bodies were found in an uninhabited environment, at least 20 meters away from the nearest road and without street lighting. (*Id.* at 59–61 (crime scene reconstruction report); *id.* at 64 (crime scene report, describing the area as "open," including cropland, and in an uninhabited environment "without street lighting with partial vehicular and pedestrian traffic").) Furthermore, there were only four residences in the vicinity overall. (*Id.* at 55 (crime scene diagram).) Additionally, as noted above, Paredes was found in a ravine in some bushes, with Cedeño approximately 50 meters away. (*Id.*, ECF No. 1-2, at 96, 98; ECF No. 1-3, at 10.) The evidence submitted by Ecuador thus demonstrates probable cause that the perpetrators and the victims left the more populated area by Cedeño's house early in the morning to go drink in a nearby "unpopulated site," where Sarmiento and Leon Heras chose to commit the killings. Accordingly, the Court finds that Ecuador has proffered sufficient evidence to establish probable cause that the killings constituted murder in violation of subsection 4 of Article 140.

2. *Murder that Intentionally or Inhumanly Increased the Victim's Pain*

Subsection 6 requires that the accused has "[i]ntention[ally] or inhumanly increase[d] the victim's pain."[12] (Extradition Request, ECF No. 1-2, at 66.) Leon Heras argues that the evidence does not "establish[] 'inhuman' infliction of gratuitous pain," and that there is no evidence of pain more than that necessary to kill. (Leon Heras Br., ECF No. 21, at 12.) Leon Heras's argument overstates the plain text of this provision, which says nothing about "gratuitous" pain or unnecessary pain. Rather, subsection 6 merely requires an intentional and inhumane "increase" in the victims' pain. Here, the murders were extremely violent, resulting in significant disfiguration of the decedents and involving repeated violent strikes with various bladed weapons and blunt objects. The nature of the wounds inventoried at autopsy illustrate ample probable cause that the manner of the killings intentionally and inhumanly increased both victims' pain.

Regarding Cedeño, the medical examiner, Dr. Dante Leon Rojas, testified at Sarmiento's trial that Cedeño's body had 37 injuries, inflicted by two assailants with "cutting, short-puncture and blunt" force. (Supplement, ECF No. 19-1, at 53 (summary of Dr. Dante Leon Rojas's testimony).) More specifically, the autopsy report indicates that the perpetrators attacked Cedeño with a sharp-pointed, bladed weapon and a blunt instrument, that he suffered an injury to his hand while defending himself, as well as multiple cuts on the face and scalp, "sharp cuts in the back wall of the thoracic cavity," and other wounds on the face and scalp caused by a blunt instrument. (Extradition Request, ECF No. 1-3, at 16 (Cedeño autopsy report).) At some point, Cedeño fainted

---

[12] Although translated in the disjunctive, through use of the word "or," the Spanish version of subsection 6 suggests that it applies in the conjunctive, i.e., where the accused "[i]ntentional[ly] [*and*] inhumanly increase[d] the victim's pain." (Extradition Request, ECF No. 1-1, at 27 ("Aumentar deliberada e inhumanamente el dolor a la víctima.").) Regardless, as explained below, the Court finds that there is probable cause that Leon Heras both intentionally *and* inhumanly increased Cedeño's and Paredes's pain.

during the assault. (*Id.*) Notably, Cedeño's face was completely disfigured, with 80% of the skin in the region of his face destroyed and an eye socket disfigured, and his skull was fractured. (*Id.* at 80 (crime scene report); *id.* at 11, 13, 16 (Cedeño autopsy report); *see also id.* at 17–19 (depicting autopsy photographs of Cedeño).) The autopsy report also indicated that the perpetrators delivered a "blunt mortal blow" that finally killed him, which produced "cranium and face destruction." (*Id.* at 16.)

Similarly, as to Paredes, the medical examiner found that he had multiple wounds to different parts of his body, including numerous stab wounds on his hands, face, and body, and that he had suffered significant facial disfigurement. (*Id.* at 21–22, 25–27 (Paredes autopsy report and autopsy photographs).) The autopsy report determined that the cause of death was homicide and that Paredes had suffered (1) "two blunt force cut wounds" to his scalp, "with characteristics of having been produced with [a] hard, blunt stick-type or metal, elongated object," and (2) three types of wounds in the facial region, some caused by a bladed weapon (such as a "knife or penknife") and other wounds "possibly caused by [a] blunt, heavy rounded object without borders or edges, as a stone," and (3) even more wounds "caused by a blunt hard elongated object." (*Id.* at 25.) In addition, the medical examiner who performed the autopsy on Paredes, Dr. Luis Rivera Suarez, testified at Sarmiento's trial that there were two types of injuries, "[b]laded weapon and blunt," and that there could have been two aggressors. (Supplement, ECF No. 19-1, at 54.)

Considering the autopsy reports and the crime scene report, the evidence submitted by Ecuador in support of extradition shows that the murder weapons used here included a machete, a knife, a broken lightbulb, and other blunt objects, such as a stick or metal, elongated object, and possibly a stone — weapons that, when used to inflict dozens of wounds, could cause an agonizing and drawn-out death. (*See*

Extradition Request, ECF No. 1-3, at 69 (crime scene report); *id.* at 4 (report regarding removal of the body, listing evidence sent to the criminology lab and police warehouses).) There is ample evidence from which to find probable cause that the victims suffered significant pain. Moreover, given the particularly gruesome nature of these murders and the significant disfiguration of the victims' bodies, the Court has little difficulty finding probable cause that the assailants intentionally and inhumanly increased the victims' pain, as would be required to sustain a conviction for murder under subsection 6 of Article 140. Under the totality of the circumstances, the Court also finds that there is probable cause to conclude that Leon Heras was responsible. As noted above, Dr. Leon Rojas specifically testified that, based on the nature of the wounds, the autopsy evidence showed that Cedeño's injuries were caused by two assailants. (Supplement, ECF No. 19-1, at 53.) Although Dr. Rivera Suarez's testimony was more equivocal on the question of whether two attackers assaulted Paredes, given the number of injuries, and the fact that Paredes suffered from two types of injuries (bladed weapon and blunt), the evidence is sufficient to establish probable cause that both Leon Heras and Sarmiento were involved in both killings. (*Id.* at 54.)

    3.  *Murder to Prepare, Facilitate, Consummate or Conceal Another Offense*

      Finally, the Court finds probable cause as to subsection 7, but only for the killing of Paredes. Subsection 7 requires that the purpose of a killing be to "[p]repare, facilitate, consummate or conceal another offense." (Extradition Request, ECF No. 1-2, at 66.) Leon Heras argues that it is "pure speculation" to suggest that Paredes was killed "in order to conceal the murder of . . . Cedeño." (Leon Heras Br., ECF No. 21, at 12.) The Court disagrees. As discussed above, the witness statements show that Cedeño was attacked before Paredes. (*See* Extradition Request, ECF No. 1-3, at 89 (statement of Luis); Supplement, ECF No. 19-1, at 46 (summary of Luis's testimony).) In addition, Luis's

account demonstrates that Paredes witnessed Sarmiento and Leon Heras attacking Cedeño, that Paredes went to seek help, and that Paredes then returned to where he had been just before. (*See* Extradition Request, ECF No. 1-3, at 89; Supplement, ECF No. 19-1, at 46.) From this evidence, it is reasonable to infer that, upon Paredes's return to the scene, Sarmiento and Leon Heras attacked him as well, either to eliminate him as a witness or because he attempted to interfere with their assault on Cedeño. This is not speculation; it is a reasonable inference from the totality of the circumstances. Accordingly, the Court finds that there is sufficient evidence to establish probable cause to believe that the murder of Paredes was, at least in part, motivated by an effort to facilitate or conceal another offense, namely, the murder of Cedeño.

However, the Court cannot draw similar inferences as to the murder of Cedeño. At most, there is some suggestion in the record that Sarmiento and Leon Heras had broken into Cedeño's home prior to his murder (potentially another offense), but there is nothing in the record from which to infer that this motivated Cedeño's murder. (*See* Supplement, ECF No. 19-1, at 57 (evaluation of the evidence).) Accordingly, based on the extradition request and Supplement provided by Ecuador, there is insufficient evidence from which to infer that the murder of Cedeño was for the purpose of preparing, facilitating, consummating or concealing another offense.

\* \* \* \* \*

The government has set forth a body of evidence that, when considered together, amply establishes probable cause to conclude that Leon Heras was involved in two killings under circumstances that qualify them as murder under Ecuadorian law, as detailed above, and that he is thus extraditable.

### III.  Humanitarian Considerations

Next, Leon Heras argues that, due to the extraordinarily dangerous prison conditions in Ecuador, this is a rare case where the Court should not follow the rule of non-inquiry. (Leon Heras Br., ECF No. 21, at 18–21.) The rule of non-inquiry generally "prohibits the extradition magistrate 'from examining the requesting country's criminal justice system or taking into account the possibility that the extraditee will be mistreated if returned.'" *In re Extradition of Cheung*, 968 F. Supp. 791, 798 (D. Conn. 1997) (quoting *In re Extradition of Sandhu*, 886 F. Supp. 318, 321 (S.D.N.Y. 1993)); *see also id.* (collecting cases). In support of his argument, Relator principally relies on the Second Circuit's observation in *Gallina v. Fraser*, where the court contemplated the possibility that an exception could be warranted in "situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency so as to require reexamination of the principle [of non-inquiry]." 278 F.2d 77, 79 (2d Cir. 1960); *see also Gill v. Imundi*, 747 F. Supp. 1028, 1049–50 (S.D.N.Y. 1990) (concluding that, on habeas review, it would be inappropriate for the district court to consider the conditions in the extraditing country, but positing that such a determination would not be "beyond the lawful purview of the magistrate judge called upon to exercise his or her judgment as to the extraditability at the certification hearing itself").

Notably, however, "[t]he '*Gallina* exception' to the rule of non-inquiry has yet to be applied." *In re Extradition of Sandhu*, 886 F. Supp. at 322. And in the years since *Gallina*, the Second Circuit has questioned whether such an exception even exists:

> A consideration of the procedures that will or may occur in the requesting country is not within the purview of a habeas corpus judge. *Gallina v. Fraser*, *supra*, 278 F.2d at 79. Indeed, there is substantial authority for the proposition that this is not a proper matter for consideration by the certifying judicial officer. In *Sindona v. Grant*, 619 F.2d 167, 174 (2d Cir.

1980), we said that "the degree of risk to [appellant's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch."

*Ahmad*, 910 F.2d at 1066 (alteration in original); *accord Suyanoff v. Terrell*, No. 12-CV-5115 (DLI), 2014 WL 6783678, at *8, n.2 (E.D.N.Y. Dec. 2, 2014); *United States v. Pena-Bencosme*, No. 05-MJ-1518 (SMG), 2006 WL 3290361, at *10 (E.D.N.Y. Nov. 13, 2006) (declining to consider evidence regarding the extraditee's safety concerns, and observing that "[w]hen determining whether to issue a certificate of extradition, courts must follow the firmly-established 'rule of non-inquiry'" (quoting *Ahmad*, 910 F.2d at 1067)).

Here, as noted above, Leon Heras introduced exhibits at the extradition hearing in support of his argument that Ecuadorian prison conditions pose an immediate and serious danger to him. (*See* Tr. at 37:1–21; Exs. 2–4 to Mot. for Bond, ECF Nos. 8-2, 8-3 & 8-4.) The Court sees no basis, however, to distinguish this case from the Second Circuit's observations in *Ahmad* and the finding in *Sindona* that such considerations "'fall[] within the exclusive purview of the executive branch.'" *Ahmad*, 910 F.2d at 1066 (quoting *Sindona*, 619 F.2d at 174). Although concerning, Leon Heras's safety concerns are "not a basis for this Court to deny extradition." *Pena-Bencosme*, 2006 WL 3290361, at *10.

## CONCLUSION

For all of these reasons, the Court finds that the crime alleged here, murder, is covered by the relevant extradition treaty, and that there is probable cause to conclude that Leon Heras committed the murders with which he is charged. Accordingly, the government's request for a certificate of extraditability is granted.

**SO ORDERED.**

Dated:  Brooklyn, New York
      June 27, 2023

               *Taryn A. Merkl*
               TARYN A. MERKL
               UNITED STATES MAGISTRATE JUDGE